**UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

DOMINIC BOUTELLE, as parent of
L.B, a minor child,

      Plaintiff,

v.                                                  Civ. No. 17-1232 GJF/SMV

BOARD OF EDUCATION OF LAS
CRUCES PUBLIC SCHOOLS,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court[1] upon "Plaintiff's IDEA Brief in Chief" ("Motion"). ECF 31.[2] The Motion is fully briefed. *See* ECFs 32 (Defendant's Response), 36 (Plaintiff's Reply). The fundamental issue before the Court is whether Defendant denied Plaintiff's son L.B. a free, appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1400 *et. seq.* Having meticulously reviewed the entire record, including the additional evidence submitted by Plaintiff, the Court concludes that Defendant did not deny L.B. a FAPE. Therefore, and for the reasons articulated below, the Court will **AFFIRM** the decision of the Due Process Hearing Officer and **DENY** Plaintiff's Motion.

---

[1] This Court is presiding as the trial court in this matter, having received the consent of the parties pursuant to Federal Rule of Civil Procedure 73(b) and 28 U.S.C. § 636(c). ECFs 10, 14, 15.

[2] Although not specifically captioned as such, the Court considers Plaintiff's filing [ECF 31] as a motion, given that it is "[a] request for a court order." Fed. R. Civ. P. 7(b); Pl's Mot. 27, ECF 31.

# I. FACTUAL BACKGROUND

Plaintiff's son, L.B., attended public school in Las Cruces, New Mexico, from kindergarten until he was about halfway through the fourth grade. Administrative Record ("AR") 25-8, 4.[3] He then moved to Arizona to live with his mother until the end of fifth grade. AR 25-4, 4-5. Around the summer of 2016, and a few months before his twelfth birthday, he moved to back Las Cruces to live with his father and then re-enrolled in the Las Cruces Public School District ("LCPS") for his sixth-grade year. AR 25-5, 179; 25-4, 5.

## A. Intervention Efforts

On September 15, 2016, a teacher told L.B. that she would call his father about a parent-teacher conference, and L.B. said he would kill himself if she called his father again. AR 25-6, 6. Upon further investigation, school officials concluded that the threat was unfounded, as L.B. later stated he was simply angry about an incident in class. AR 25, 37-39, 47. They nevertheless explained to Plaintiff various options available to assist L.B., including having a formal committee review L.B.'s behavior issues and make recommendations, which could include a psychological screening and a full psychological evaluation. AR 25-4, 47-48. Plaintiff was open to these options and told school officials that L.B. felt abandoned by his mother, something Plaintiff believed was contributing to the behavioral issues that L.B. was exhibiting. *Id.*; AR 25, 47.

Although L.B. had "As and Bs" in all of his classes, school officials remained concerned about his behavior—specifically his "non-compliance" and his "bullying/intimidating" behaviors. AR 25-6, 12, 14.[4] Consequently, on October 11, 2016, school officials held a formal committee

---

[3] The 2,603-page administrative record filed in this case is divided into ten separate sections, with each section corresponding to its assigned electronic case file number ("ECF") and, if applicable, its attachment number. For purposes of this order, a citation of the form "AR 25-8, 4" would refer to page four in attachment eight of ECF 25.

[4] For example, school records document L.B. threatening another student while on the bus, stating "watch what you do or I'll kick your ass." *Id.* at 49; *see also id.* at 46-55 (additional records of intimidating conduct), 147 (calling a student's mother "a whore" because "he felt like it"). Records also document that L.B. was suspended several times

meeting, which Plaintiff attended, to discuss potential options for helping L.B. succeed. *Id.* at 11-17. This meeting was held pursuant to the procedures established by New Mexico's "three-tier model of student intervention . . . for students who demonstrate a need for educational support for learning or behavior." N.M. Code § 6.29.1.9(E).[5] At the meeting, Plaintiff mentioned that he did not believe his son actually had ADHD. AR 25-6, 17.[6] Instead, as the school documented in its record of this meeting, the conclusion was that L.B. appeared to be suffering from "separation anxiety from mom" and "chronic stressors." *Id.* at 14, 16. The school agreed to do a "Functional Behavior Assessment," implement "positive behavioral supports," and—should such support prove ineffective—a psychological screening, which Plaintiff consented to on behalf of L.B. *Id.* at 12; AR 25-5, 441. In November 2016, this assessment found that L.B.'s behavior stemmed from "a performance deficit and the function for attention seeking" and made various recommendations to help teachers better work with him. AR 25-5, 442; AR 25-8, 24.[7]

Around January and February 2017, teachers indicated that these interventions began to lose their effectiveness and, aside from one class, L.B.'s behavior generally began to worsen. AR 25, 32, 63; AR 25-1, 15, 53; AR 25-6, 66.[8] Consequently, the school held another committee

during the fall of 2016 for "stabb[ing] another student in the back of the head with a mechanical pencil," "inappropriate physical contact . . . grabb[ing] and scratch[ing] another student" on the back of the neck, and throwing a pencil for the second time in class. *Id.* at 149-51.

[5] Tier 1 includes "screening in the areas of general health and well-being" and language and academic proficiency for each student. *Id.* Tier 2 includes a formal process to assist students "experiencing academic or behavioral difficulties" to help them "succeed in the general education program, but also reduce unnecessary or inappropriate referrals to special education." *Id.* at 6.29.1.7(CM), 6.29.1.9(E); NM Pub. Ed. Dep't, *The Student Assistance Team and the Three-Tier Model of Student Intervention*, p. 44 (2009). Tier 3 includes assistance for any student "identified as a student with disability." N.M. Code § 6.29.1.9(E).

[6] Although the record of this meeting documents this exchange, Plaintiff later disputed it at the hearing. AR 25-4, 12.

[7] The recommendations included validating L.B.'s opinions, making regular and personal contact with him, discussing his behavioral choices in place of punishment, indicating disappointment with negative behaviors, and reminding him of what his father would think of such behaviors. *Id.*

[8] For example, in mid-January, a teacher documented L.B. telling another student to "shut his crusty ass up." *Id.* at 147. Then, in early February, this same teacher emailed Plaintiff, asking for recommendations of what to do when

3

meeting on February 14, 2017, which resulted in the creation of a "Behavior Intervention Plan" and the decision to obtain a psychological screening for L.B. AR 25-8, 46-49. Shortly thereafter, however, the school and Plaintiff agreed to hold off on the screening, as Plaintiff was already in the process of having a private comprehensive evaluation performed on L.B. AR 25-3, 57.

Near the beginning of March 2017, L.B. received his sixth suspension of the school year, this time for creating an "unsafe condition" by throwing tape in class. AR 25-6, 149-54. After having already thrown the tape twice and receiving two warnings from the teacher, L.B. threw the tape a third time and struck another student, causing redness under the student's eye that required treatment from the school nurse. *Id.* at 154. A few days later, on March 8, 2017, a teacher documented L.B.'s behavior in class that day, noting some positive behaviors and a significant amount of negative behaviors:

> Today was a good day for [L.B.] in that he completed his warm-up in a timely manner, did the day's assignment to 81% mastery, and didn't play a single computer game. However, it did come with some negatives: 15 uses of profanity or near profanity, 12 outbursts (screams, grunts, or noises not counted with profanity and granting a lot of leeway with talking), 1 belch, and 2 incidents of messing with a classmate's computer (unplugging it and then pulling the monitor by the cord).

AR 25-6, 146.[9]

---

L.B. "blurts out inappropriate comments." *Id.* at 72. She stated, "It seems like nothing is helping anymore with me in my classroom. Today he told another student to 'shove it up his ass' . . . [when] the other student didn't do anything to deserve that . . . all he asked [L.B.] was to pick something up." *Id.* Plaintiff replied, stating "I don't have this issue at home *ever*. I hear these reports from you all and it blows my mind because I don't have that issue at all and he knows cussing is not allowed. . . . I don't know what to do because . . . it *never* happens at home." *Id.* (emphasis added).

[9] The teacher's documentation also included the following comments about L.B.: "threw a toy car at [student] and hit him in the head" (11/28/16); "incorrigible today and all week" (1/19/17); "[w]rote up for incorrigible behavior: inappropriate noises, vulgarities, and generally disruptive behavior," including calling teacher "Buttercup," calling teacher's suggestion "the gayest thing I ever heard," and screaming "you rapist!" when teacher turned off his computer (1/24/17); "[u]sual loudness and rudeness (forcibly belching) but no vulgarity as of this writing (2:37) [but by] 2:39, he started with his 'mother trucker' outbursts" and also "hit [student] in groin" when confronted for interfering with that student's computer (4/13/17);. *Id.* at 119, 123, 131, 146. The teacher also testified that when belching, L.B. would stretch his arms out, tilt his head back, and then belch "as loud as he possibly could" during class. AR 25-1, 5.

## B.  Long-Term Suspension

On April 19, 2017, Plaintiff provided the school with a "Comprehensive Neuropsychological Examination," which studied L.B.'s neurological and psychiatric systems and for which Plaintiff was charged $1,866.60.  AR 25-6, 168-83.  The examination did not diagnose L.B. with the neurological condition of Tourette syndrome ("TS"), but rather diagnosed him with ADHD, disruptive mood dysregulation disorder, post-traumatic stress disorder, and "parent-child relational" and "academic or educational" problems.  AR 25-4, 72, AR 25-6, 181, 349.

On this same day, while walking to the bus after school, L.B. began throwing rocks at students.  AR 25-6, 159-60.  After investigating the incident—including interviewing witnesses, collecting statements, and completing a police report—the principal concluded that L.B. had intentionally thrown several rocks at two students and injured them.  *Id.* at 159-64; AR 25-8, 62-67.  Specifically, he found that L.B. struck one student's lower body with four rocks (which one student stated were golf ball sized) and then—after stating something along the lines of "do you think I can hit him with a rock?"—struck another student from behind in the "head/neck" area with a rock.  AR 25-6, 159-60.  L.B. was immediately suspended for ten days and, after a long-term suspension hearing, was placed on long-term suspension for six months.  *Id.* at 166; AR 25-8.

About one week later, after formally considering the private examination provided by Plaintiff, the school's "Multidisciplinary Evaluation Team" concluded that L.B. was eligible for "Special Education as a child with a disability" due to the conditions of "Other Health Impairment" (based on ADHD) and "Emotional Disturbance."  AR  25-8, 68-82; AF 25-5, 448.  The school then conducted a "Manifestation Determination" review and found that the behavior for which L.B. was to be suspended long-term was "not a manifestation of his disabilities," a finding that must be made before such a suspension can take effect.  AR 25-6, 196-99.  Afterwards, in early

May 2017, the Individualized Education Program ("IEP") team held a meeting, which Plaintiff attended, and developed an IEP for L.B. that would provide services to him while he attended the CrossRoads alternative school during his long-term suspension. *Id.* at 204-21. The IEP included L.B. spending 80 percent or more of the day in the regular classroom, a "behavior intervention plan," 50 minutes of case management service per week, and weekly mental health services. *Id.* at 220.

Plaintiff was given the option of having L.B. simply stay home for the remainder of the school year, as the CrossRoads special education teacher believed it would not be productive for L.B. to enter a brand-new environment so close to the end of the school year. AR 25-4, 30. Plaintiff thus chose to have L.B. stay home for the remaining few weeks of his sixth-grade school year and then, after the summer break, attend CrossRoads for the start of his seventh-grade year. *Id.* Plaintiff, however, still had concerns about this alternative school, specifically that L.B. would be associating with—and influenced by—the "delinquents" who were sent there. *Id.* at 31. Sometime over the summer break, Plaintiff's real estate attorney mentioned to him that TS could sometimes be associated with ADHD, which prompted Plaintiff to begin researching on his own whether L.B. could also have TS. *Id.* at 43.

### C.  Due Process Hearing and Decision

Shortly thereafter, at the end of July 2017, Plaintiff requested an administrative due process hearing under the IDEA. AR 25-5, 9-24. Plaintiff claimed that LCPS denied L.B. a FAPE, grounding this claim primarily on the assumptions that L.B. indeed had TS, that many of L.B.'s behavioral issues had been manifestations of TS, and that the school should have suspected and then accounted for the possibility that L.B. could have had TS. *Id.* at 17-22. Plaintiff proposed resolving his complaint through, *inter alia*, LCPS returning L.B. to his home school, reimbursing

Plaintiff for $1,866.60 in medical evaluation expenses, and paying for a TS evaluation, along with attorney fees. *Id.* at 22-24.

The parties participated in a five-day due process hearing before an impartial Due Process Hearing Officer, Morgan Lyman, Esq., in September 2017. *Id.* at 426. In November 2017, the hearing officer issued a decision in favor of LCPS. AR 25-5, 483-86. In doing so, however, he first found certain procedural errors but ultimately found such errors to be harmless. *Id.* at 486.

### 1. Screening for a Disability

The hearing officer found two procedural violations under the IDEA for the school's failure on two separate occasions to make "a referral for a screening or to a licensed healthcare professional for an assessment related to a disability." *Id.* at 457. First, the hearing officer found that at the formal meeting on February 14, 2017, where the school decided to proceed with a psychological screening, a "suspicion of a disability" had arisen such that the school was "procedurally bound to proceed" with the screening. *Id.* Although Plaintiff and the school agreed soon afterwards to "hold off" on the screening pending the private evaluation, the hearing officer reasoned that the "identification and evaluation burden" nevertheless remained with the school. *Id.* at 443, 457.

Second, the hearing officer found that as of March 8, 2017, the school "suspected that [L.B.] had a disability potentially for TS for which a screening would have been appropriate" based on L.B.'s classroom behavior that day. AR 25-5, 445-46. He also found that "other behaviors exhibited by [L.B.]" before March 8, 2017, "did not amount to a suspicion for a referral." *Id.* at 446. In making these findings, he gave significant weight to the testimony of Martin Greer, Ph.D., the school's supervising psychologist, who is also in private practice. *Id.* at 445, 454. Dr. Greer opined that L.B.'s behavior that day "could raise a suspicion for further screening and possible

evaluation for [TS]" but that other behaviors exhibited by L.B. "did not amount to a suspicion." *Id.* at 445; AR 25-2, 54-55.[10]

The hearing officer then proceeded to the second prong of his analysis: determining whether these two procedural violations established a denial of FAPE. AR 25-5, 457-62. Based on the full record, the hearing officer found that Jo Velasquez, Ph.D., the psychologist who had performed the private evaluation of L.B., had "performed a *complete* neurological and psychological evaluation which had the capacity to diagnose TS, but did not result in a diagnosis of TS." *Id.* at 460 (emphasis added). The hearing officer concluded that Plaintiff "did not meet his burden to show that the March 8, 2017 'suspicions' would have otherwise changed the validity of [this private evaluation], which did not result in a diagnosis of TS." *Id.* at 461. He further concluded that Plaintiff's own private and timely evaluation thus "supplanted" both of these violations by fulfilling the "underlying purpose" of the procedural rule at issue: "the required screening, assessment, or evaluation." *Id.* He further reasoned that these two violations did not compromise L.B.'s right to a FAPE, seriously hamper Plaintiff's opportunity to participate in the decision-making process, or cause the deprivation of an educational benefit. *Id.* at 461-62. Therefore, the hearing officer held that these violations did not result in a denial of FAPE. *Id.* at 457, 460-62.

The hearing officer further concluded that Plaintiff could not be reimbursed for the $1,866.60 he spent on the private evaluation. *Id.* at 465. He reasoned that there were only two avenues for such a reimbursement: (1) as a remedy for a denial of FAPE, or (2) if the evaluation

---

[10] At the hearing, Dr. Greer stated that for "[e]verything else we've looked at . . . the simpler, more likely answer is the ADHD coupled with the DMDD [disruptive mood dysregulation disorder]" and expressed his desire for more information and context about L.B.'s behavior in class on March 8, 2017, "particularly the 12 outbursts, screams, grunts, noises not counted with profanity when he's having what's considered to be . . . a good day," stating "there's a lot of things . . . that this note does not tell us." *Id.* at 55.

was an "Independent Educational Evaluation," which must be specifically requested after "the parent disagrees with an evaluation obtained by the public agency." *Id.*; 34 C.F.R. § 300.502. And because there was neither a corresponding FAPE denial nor an Independent Educational Evaluation, he denied Plaintiff's request. AR 25-5, 465-66.

### 2. *Suspension for Rock Throwing*

The hearing officer upheld the long-term suspension of L.B. *Id.* at 481-83. He found that L.B. intentionally threw rocks at other students, causing injury to two of them, and that "the reason for the suspension . . . was because [L.B.] had created an unsafe condition by [this] rock throwing event." *Id.* at 447, 468. He further found that the "Manifestation Determination" team considered "only the rock throwing event"—and not L.B.'s prior misbehavior incidents—when it concluded that L.B.'s conduct was not a manifestation of his disability. *Id.* at 468-69.

But the hearing officer also discerned a procedural violation because this team and Plaintiff were not provided a copy of three witness statements from other students and because the team did not receive a copy of the "Long Term Suspension Packet." *Id.* at 472-73. The hearing officer found that this was a FAPE violation, as it "significantly impeded [Plaintiff's] opportunity to participate in the Manifestation Determination IEP process." *Id.* at 473. Nevertheless, the hearing officer did not award an equitable remedy for this violation, as he found that Plaintiff was unable to show either that the underlying misconduct (i.e., intentionally throwing rocks at and injuring other students) did not occur or that a different result would have occurred had these witness statements and suspension packet materials been provided. *Id.* at 447, 482-83.

### D. Additional Relevant History

Shortly before the due process hearing, Plaintiff attempted to schedule an evaluation of L.B. for TS at the "Tourette Center for Excellence at Baylor." Pl.'s Mot. 3, ECF 31. During the

hearing, Plaintiff argued that L.B. displayed symptoms of TS, a condition defined by "involuntary, repetitive movements and vocalizations," during the school year. *Id.* at 1-3, 18, 27; AR 25-5, 453; AR 25-6, 312.[11] The evaluation for TS, however, occurred after the hearing, and the resulting report, which the school incorporated into L.B.'s IEP the following year, was issued after the hearing officer's decision. *Id.*[12]

One month after the hearing officer's decision, Plaintiff filed suit in this Court, claiming LCPS denied L.B. a FAPE and asking this Court to reverse the hearing officer's decision and award an equitable remedy. Pl.'s Compl. 1, 12, ECF 1. As an equitable remedy, Plaintiff requests that the Court order LCPS to (1) correct L.B.'s educational records to reflect that he was "erroneously punished," (2) reimburse Plaintiff for the costs of L.B.'s neuropsychological and TS evaluations, and (3) update L.B.'s IEP consistent with his TS evaluation. Pl.'s Mot. 27.[13]

## II. PLAINTIFF'S CLAIMS

Plaintiff claims that LCPS denied L.B. a FAPE in the following ways: (1) not evaluating L.B. for a disability during the fall of 2016, (2) relying in the formation of L.B.'s IEP on the private evaluation that L.B.'s father personally procured, (3) not having the IEP in place until later in the 2016-17 school year, and (4) placing L.B. on long-term suspension. Pl.'s Mot. 11-26.

Finally, Plaintiff contends that the hearing officer wrongly excluded certain evidence as irrelevant, specifically pointing to his refusal to consider testimony about the programs at

---

[11] These involuntary "tics" can be simple or complex, and in about 10-15 percent of cases could include the complex vocalization of "socially unacceptable words or phrases." *Id.* Furthermore, this condition "commonly co-occurs with a number of other neurodevelopmental and neuropsychiatric conditions," such as ADHD, behavior problems, anxiety, mood problems, and social relationship problems. *Id.* at 314. TS, like ADHD, is classified as an "Other Health Impairment" disability for which special education services may be provided. 34 C.F.R. § 300.8(c)(9).

[12] Plaintiff nevertheless separately submitted this report for this Court's review. *See* ECFs 56 (Court ordering Plaintiff, pursuant to his "Motion for Consideration of Additional Evidence" [ECF 43], to submit the TS evaluation report), 61 (Plaintiff's submission of the report); Section IV(a)(2), *infra* (incorporating the Court's analysis of this report).

[13] Plaintiff also requests that the Court issue a briefing schedule to consider awarding attorney fees. *Id.*

CrossRoads and documentation that showed TS treatment center locations and a scheduled appointment at one of those centers. *Id.* at 3 n.4, 26; AR 25-4, 31-33; AR 25-5, 450, 452-53.

## III. APPLICABLE LAW

### A. Standard of Review

When reviewing an agency decision under the IDEA, the Court must apply a "modified *de novo*" standard of review. *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008). Specifically, the Court is to (1) "receive the records of the administrative proceedings," (2) "hear additional evidence at the request of a party," and (3) "grant such relief as the court determines is appropriate" with its decision based "on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see Garcia*, 520 F.3d at 1125. In further clarifying this standard, the Supreme Court has stated that "due weight" must be given to the administrative proceedings. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982). Furthermore, the factual findings from these proceedings must be "considered *prima facie* correct." *Garcia*, 520 F.3d at 1125 (quoting *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004)).

"In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207. "The district court's proceedings must maintain a character of review and not rise to the level of a *de novo* trial." *L.B. ex rel. K.B.*, 379 F.3d at 974. Legal conclusions, however, are reviewed under the "usual *de novo* standard." *O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998).

## B. Applicable IDEA Requirements

"The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to 'a free appropriate public education … designed to meet their unique needs.'" *Association for Community Living v. Romer*, 992 F.2d 1040, 1042-43 (10th Cir. 1993) (quoting 20 U.S.C. §1400(c)). The basic mechanism for achieving that goal is through the IEP. *See Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 994 (2017) ("The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." (quoting *Rowley*, 458 U.S. at 181)).

The Act has numerous procedural requirements, which are "designed to ensure that an IEP is properly developed for each child and that parents or guardians have significant involvement in the educational decisions involving their children." *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 925 (10th Cir. 1995). The Act also has substantive requirements, which are "designed to ensure that each child receives the 'free appropriate public education' mandated by the Act." *Id.*; *see also Honig v. Doe*, 484 U.S. 305, 310 (1988) (observing that although the IDEA is ostensibly a funding statute, it "confers upon disabled students an enforceable substantive right to public education in participating States and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." (citations omitted)).

The Supreme Court has thus established a twofold inquiry—a procedural inquiry and a substantive inquiry—that courts are to follow in determining whether the requirements of the Act have been met. *Rowley*, 458 U.S. at 206-07. First, the court determines whether "the State complied with the procedures set forth in the Act." *Id.* at 206. The court next determines whether "the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive

educational benefits." *Id.* at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207.

### 1. Procedural Requirements

Regarding the first inquiry—whether "the State complied with the procedures set forth in the Act"—the Supreme Court has emphasized the importance of the Act's "procedural safeguards." *Id.* at 205 ("When the elaborate and highly specific *procedural* safeguards embodied in [the IDEA] are contrasted with the general and somewhat imprecise *substantive* admonitions contained in the Act, . . . the importance Congress attached to these *procedural* safeguards cannot be gainsaid." (emphasis added)).

Nevertheless, a procedural error "does not necessarily entitle a student to relief for past failures by the school district." *Systema ex rel. Systema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008). Unless the procedural violation also resulted in a "substantive deprivation," i.e., a denial of a disabled student's right to a FAPE, the student is not entitled to compensatory relief, such as an award of "compensatory education." *Urban ex rel. Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 726-27 (10th Cir. 1996).[14]

Therefore, if the Court concludes that a procedural error occurred, it must then determine whether that violation also resulted in the denial of a FAPE. *Systema*, 538 F.3d at 1313 ("In sum, then, the courts inquire whether the [procedural] violation resulted in the denial of a FAPE."); 20 U.S.C. § 1415(f)(3)(E). A court may find that a procedural violation denied a student a FAPE only if that violation (1) resulted in "substantive harm to the child or his parents," (2) "deprive[d] an

---

[14] *See also Garcia*, 520 F.3d at 1125-27 (observing "liability under IDEA is determined . . . [by] whether the . . . procedural failures resulted in a denial of educational benefit to the student" and that "procedural failures . . . amount to substantive failures only where the procedural inadequacy results in an effective denial of a FAPE"); *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001) ("Procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of educational opportunity."); *O'Toole*, 144 F.3d at 701 ("[T]echnical deviations from the requirements . . . do not render an IEP entirely invalid; to hold otherwise would exalt form over substance." (quotation marks omitted) (quoting *Urban*, 89 F.3d at 726)).

eligible student of an [IEP]," or (3) "result[ed] in the loss of [an] educational opportunity." *Systema*, 538 F.3d at 1313 (quoting *Knable v. Bexley City School Dist.*, 238 F.3d 755, 765-66 (6th Cir. 2001)) (brackets in original).[15]

### 2. Substantive Requirements

Regarding the second inquiry— whether "the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits"—the Supreme Court has recently clarified the standard for determining when such "educational benefits" are sufficient. *Endrew F.*, 137 S. Ct. at 993. Specifically, the Court held that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

The Court further explained that "[t]he adequacy of a given IEP turns on the unique circumstances of the child" and that "[t]his absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* at 1001 (citing *Rowley*, 458 U.S. at 206). Instead, the Court explained that deference should be given to the expertise of and judgment of school authorities when considering an IEP's adequacy:

> At the same time, deference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. *See* 20 U.S.C. §§ 1414, 1415; *Rowley*, 458 U.S. at 208-209. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their

---

[15] *See also* 20 U.S.C. § 1415(f)(3)(E) (permitting a hearing officer to find that a procedural violation resulted in FAPE denial only if that violation (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or (3) "caused a deprivation of educational benefits").

decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F.*, 137 S. Ct. at 1001-02. Finally, the Supreme Court stated that a court's "review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999 (emphasis in original).

## IV. ANALYSIS

### A. LCPS Was Not Required to Evaluate L.B. for a Disability during the Fall of 2016.

Plaintiff claims that LCPS denied L.B. a FAPE by not evaluating him for a disability during the fall of 2016. Pl.'s Mot. 11-22. Plaintiff asserts that certain behaviors of L.B. (e.g., belching, "inappropriate noises," "swinging a lanyard around," and taking items such as pencils, phones, and backpacks from other students) could not have matched L.B.'s "otherwise respectful behavior in school." *Id.* at 14, 19.[16] Thus, Plaintiff argues that the school should have suspected a disability shortly after L.B.'s arrival—and it therefore denied him a FAPE by not evaluating him that fall. *Id.* at 18-19. As explained below, this Court disagrees.

#### 1. *Applicable Procedural Requirements*

The IDEA imposes a "child find" obligation on the school, which requires the school to identify and evaluate the following category of children: "[a]ll children [1] with disabilities . . . regardless of the severity of their disabilities, and [2] who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3); *see also Cudjoe*

---

[16] The Court notes, however, that not all of the referenced behavior necessarily occurred during the fall of 2016. For example, the referenced "screams, grunts or noises" occurred on March 8, 2017. *Id.* at 14; AR 25-6, 146. The referenced "vulgar comments" occurred on January 24, 2017. Pl.'s Mot. 14; AR 25-6, 123-24. The referenced "constantly blurting out inappropriate comments" was documented by a teacher on February 2, 2017. Pl.'s Mot. 14; AR 25-6, 147. The referenced "chronic" disruptions were documented on February 14, 2017. Pl's Mot. 14; AR 25-6, 61; *see also id.* at 124, 127 (also documenting "chronic classroom disruptions" on January 24 and February 9, 2017). The referenced "different noises," "mother trucker," and "tilting his head back and belching" incidents were not assigned any specific timeframe by the teacher who observed them. Pl.'s Mot. 14; AR 25-1, 5 (teacher testifying "there were different noises at different times, so I don't have a specific recollection"). Likewise, the reference to taking other students' property is not connected to a specific timeframe in the record. Pl.'s Mot. 14; AR 25, 50.

*v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1066 (10th Cir. 2002) ("[T]he school bears the burden generally in identifying eligible students for the IDEA."). This child-find requirement also extends to "[c]hildren who are *suspected* of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1) (emphasis added).

Although not specifically articulated by 10th Circuit, this child-find duty appears to arise when a disability that might require special education services is "suspected." *See Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016) ("Our precedent establishes that a disability is 'suspected,' and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability."); *Smith v. Cheyenne Mt. Sch. Dist. 12*, No. CV 15-00881-PAB-CBS, 2017 WL 2791415, at *18 (D. Colo. May 11, 2017), *report and recommendation adopted*, No. 15-CV-00881-PAB-CBS, 2017 WL 2778556 (D. Colo. June 26, 2017) ("The [child-find] duty is triggered when the [school] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability." (quoting *Wiesenberg v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 181 F. Supp. 2d 1307, 1310-11 (D. Utah 2002)); *cf. W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995) (holding that the child-find duty requires children to be identified and evaluated "within a reasonable time after school officials are *on notice* of behavior that is likely to indicate a disability" (emphasis added)); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009) (referring to a school that would have "*unreasonably* failed to identify a child with disabilities" (emphasis added)).

Although a child-find violation appears to be procedural,[17] the ultimate determination—whether L.B. was denied a FAPE—remains the same regardless of how the violation is

---

[17] The Tenth Circuit has not addressed whether a child-find error is properly characterized as a procedural violation, but other Courts of Appeals have characterized it as such. *See, e.g., P. v. West Hartford Bd. of Educ.*, 885 F.3d 735,

characterized. If the violation is procedural, then this Court "inquire[s] whether the violation resulted in the denial of a FAPE," specifically by analyzing whether the procedural violation caused (1) "substantive harm" to L.B. or his parents, (2) a deprivation of an IEP for L.B., or (3) the loss of an "educational opportunity." *Systema*, 538 F.3d at 1313. If a FAPE denial is not found under this "procedural" inquiry, or if the child-find violation is not considered procedural, the Court may nevertheless still find a FAPE denial under its "substantive" inquiry. *Rowley*, 458 U.S. at 206-07. Under this inquiry, the Court asks whether the school met "its substantive obligation . . . [to] offer an IEP reasonably calculated to enable [L.B.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999.

### 2. Analysis

Plaintiff must overcome two hurdles—one procedural and one substantive—to successfully argue that LCPS denied L.B. a FAPE by not evaluating L.B. for a disability during the fall of 2016. Plaintiff must first establish that—in the fall of 2016—the school's child-find duty had been triggered, i.e., that LCPS had reason to suspect that L.B. was suffering from a disability that might require special education services. If Plaintiff establishes that LCPS breached this child-find duty, he must then establish that such a procedural violation also resulted in a "substantive deprivation," i.e., the denial of a FAPE. As explained below, however, this Court concludes that prior to February 14, 2017, the child-find duty was not triggered and LCPS therefore did not deny L.B. a FAPE by not evaluating him the preceding fall.

---

750 (2nd Cir. 2018) ("In accord with other Courts of Appeals, we consider a violation of the Child Find obligation a procedural violation of the IDEA." (citing *D. K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3rd Cir. 2012); *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007))); *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118-19, 24 (9th Cir. 2016) (analyzing a child-find error as a violation of the "procedural requirements of the IDEA").

To begin, the hearing officer found that a "suspicion of a disability" had only first arisen at the formal meeting on February 14, 2017, when the school found that it was appropriate to proceed with a psychological screening. AR 25-5, 457. The hearing officer based this finding on the school committee's suspicion that a disability might exist and also his review of L.B.'s behavior, as described in the documentary evidence and witness testimony, including the testimony of two experts, Drs. Greer and Amber Hayes, Psy.D. *See id.* at 441-45, 457. In reviewing this evidence, he also noted his specific factual findings regarding L.B.'s behavior. *Id.* at 443-45 (finding L.B. engaged in, *inter alia*, "obscene name calling," "treating teachers with disrespect," "shouting out answers to math problems," "speaking out of turn," "get[ting] physical with peers," using "vulgarities," intentionally and frequently belching "as loudly as he possibly could," and making "disparaging and disrespectful remarks" to a particular teacher). In addition, the hearing officer also found that "after the winter break, in January and February [2017], some of [L.B.'s] behaviors escalated, although in one class his behavior improved." *Id.* at 442. Furthermore, he reviewed and discussed the testimony of Dr. Hayes, who saw no evidence of TS. *Id.* at 445, 452. He also reviewed the testimony of Dr. Greer, who likewise saw no evidence of the involuntary movements or vocalizations that define TS. *Id.* at 445, 450-51; AR 25-2, 10. And aside from questioning L.B.'s classroom behavior on March 8, 2017, Dr. Greer further opined that all of L.B.'s other behaviors simply did not raise any suspicion for TS. AR 25-5, 445; AR 25-2, 53-55; *see also supra* note 10.

In support of his position, Plaintiff cites to no medical, professional, or expert opinions or testimony that conclude that the school had any reason to suspect a disability in *the fall of 2016*. Pl.'s Mot. at 11-22. Instead, Plaintiff refers to some of L.B.'s behavioral issues—much of which occurred after the fall of 2016 (e.g., "vulgar comments" in January, "chronic" disruptions in

February, and a particular classroom incident that involved "screams, grunts or noises" in March). *Id.* at 14; *supra* note 16. Plaintiff essentially argues that—in the fall of 2016—the school therefore had a reason to suspect a disability because those behaviors simply could not have been consistent with L.B.'s "otherwise respectful behavior in school." Pl.'s Mot. 14, 18-19. In other words, with the record devoid of any evidence that L.B. had aroused suspicions strong enough to suggest a disability evaluation during L.B.'s first six years of school, Plaintiff asserts that LCPS nevertheless should have suspected a disability within the first three or so months after L.B.'s arrival at his new school in New Mexico—all based on behaviors that mostly occurred *after* this time frame.[18]

The Court has also reviewed the additional evidence submitted by Plaintiff, which consisted of one "Progress Notes" medical record documenting L.B.'s evaluation for TS in late November 2017—*after* the hearing officer had issued his decision.[19] After considering this additional evidence,[20] the entire case record, the thorough factual findings made by the hearing

---

[18] Plaintiff also implies that the formal, progressive steps that the school took to address L.B.'s behavior—which were based on the three-tier model of intervention in New Mexico—should have been immediately bypassed and that the school should have "jump[ed] to the conclusion that [L.B.'s] misbehavior denoted a disability." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3rd Cir. 2012); *see also id.* at 252 (concluding "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment").

[19] Significantly, this seven-page medical note from the Baylor College of Medicine, which knew of L.B.'s long-term suspension and the "due process lawsuit," does not explicitly diagnose L.B. with TS—or any other condition. ECF 61-1 at 1-7. The note nevertheless contains an "Impressions" section, which states that L.B.'s "history and examination" were only "*consistent* with a diagnosis of [TS]" (as well as with "ADHD, and leg stereotypy disorder"). *Id.* at 5 (emphasis added). The evaluation, which also relied on L.B.'s *purported* history of symptoms, thus did not rule out TS as a possibility—but neither did it declare TS as a diagnosis. *Id.* at 2, 5. Furthermore, as though the provider wanted to avoid diagnosing L.B. with TS—while simultaneously making L.B. (and his father) feel as though they had the diagnosis they were seeking—the note ambiguously states the following as the first item in the "Recommendation" section: "*[t]he* diagnosis of [TS] was discussed with the patient and his father." *Id.* (emphasis added). The reader is thus left wondering whether the provider, for example, really meant to state that he discussed "*L.B.'s* diagnosis" of TS (while perhaps inadvertently omitting to make such diagnosis anywhere else in the medical records) or, as appears more likely, whether he merely discussed "the diagnosis" of TS and how L.B.'s evaluation compared to it—e.g., by being *consistent* with (but not conclusively establishing) such a diagnosis.

[20] The Court considers this additional medical note evidence to be somewhat suspect. First, it contains no specific diagnosis or statement that L.B. actually had TS. *See supra* note 19. Second, it never classified L.B.'s movements as "involuntary"—a requirement for a TS diagnosis. *See* ECF 61-1 at 1-7; *see also* AR 25-6, 312 (defining the "tics" that comprise TS as "involuntary, repetitive movements [or] vocalizations"); AR 25, 14 (affirming that "involuntary movement" and "involuntary noise or . . . oral sounds" are required for a TS diagnosis). Rather, the note classified

officer, the "due weight" this Court must give to such findings, and the simple lack of evidence that a "suspicion" existed in the fall of 2016, this Court is not persuaded that the school had a reason to suspect a disability during the time frame advanced by Plaintiff. Thus, giving "'due weight' to the hearing officer's findings of fact, which are considered *prima facie* correct," *L.B. ex rel. K.B.*, 379 F.3d at 974, this Court concludes that prior to February 14, 2017, LCPS did not have reason to suspect a disability that might require special education services.

In conclusion, because the school had no reason to suspect a disability before February 14, 2017, the child-find duty to identify and evaluate disabled children who need special education services was not triggered before this date. Thus, at least until February 14, 2017, the school had neither a child-find duty nor a "substantive obligation . . . [to] offer an IEP" to L.B. as a disabled student. *Endrew F.*, 137 S. Ct. at 999. The Court therefore concludes that LCPS did not deny L.B. a FAPE by not pursuing a psychological evaluation of him before February 14, 2017.

## B. The School's Reliance on the Private Evaluation Did Not Deny L.B. a FAPE.

Plaintiff claims that he was "forced" to seek and pay for a private evaluation in February 2017 because the school had not yet sought one. Pl.'s Mot. 23. He also implies that the school actually "refuse[d]" to seek one. *Id.* Plaintiff argues that, by relying on this private evaluation,

_____

his movements as only "compulsive," which the note described as an "urge" to make certain movements—an urge which L.B. is "able to suppress" but which "continues to build stronger until [L.B.] has to *perform* the tic." ECF 61-1 at 2 (emphasis added); *see also id.* (also stating "[L.B.] has an urge and sense of relief with each movement" but that he is able to "suppress [his urge to utter socially unacceptable words or phrases] in public"). Third, the 2,603-page administrative record contains essentially no evidence that L.B. even had the symptoms that were observed in his TS evaluation—i.e., issues with "frequently adjusting his shirt [or] is hat" or with "frequent shoulder shrugs, arm rubbing, knuckle popping, [or] foot tapping"—but these are the very symptoms that caused "[h]is examination [to be] significant." *Id.* at 5. (Although the administrative record documents *one* single incident of L.B. tapping his feet, it occurred during an interview with a school counselor while L.B. was angry and while the counsellor was performing a threat assessment after L.B. made an (unfounded) threat in class that he would kill himself. AR 25, 37.) This medical note thus appears to offer little more than a non-committal discussion on somewhat contrived symptoms—further reinforcing an attitude of entitled victimhood instead of responsibility when it comes to L.B.'s misbehavior at school—and the Court gives this note little weight. Furthermore, even if this additional evidence definitely established that L.B. did have TS—and had it during the 2016-2017 school year—this Court nevertheless finds nothing in this evidence that, either standing alone or combined with the other evidence, would have given the school a reason to suspect, within the first few months after L.B.'s arrival, that L.B. had a disability.

LCPS denied L.B. a FAPE, as his access to public education was no longer "free." *Id.* This Court disagrees.

As an initial matter, the school neither forced Plaintiff to obtain a private evaluation nor refused to evaluate L.B. Instead, the record makes clear that the school decided on February 14, 2017, to proceed with a psychological screening—but because Plaintiff wanted L.B. evaluated by a private evaluator and was in the process of having a private evaluation done, the school and Plaintiff both agreed that the school would "hold off" on the screening. AR 25-8, 46-49; AR 25-5, 441, 443; *see also* AR 25-6, 12 (Plaintiff consenting on October 11, 2016, to a psychological screening for L.B. that might occur "later"—but only if the planned behavioral intervention efforts proved ineffective).

Assuming that LCPS had reason to suspect on February 14, 2017, and/or again on March 8, 2017, that L.B. had a disability that might require special education services, LCPS would have been subject to the child-find procedural obligation under the IDEA. AR 25-5, 457. But even if the school's decisions not to pursue its own evaluation of L.B. amounted to procedural violations, LCPS nevertheless did not deny L.B. a FAPE.[21] As mentioned, a court may find that a procedural violation denied a student a FAPE only if that violation (1) resulted in "substantive harm to the child or his parents," (2) "deprive[d] an eligible student of an [IEP]," or (3) "result[ed] in the loss of [an] educational opportunity." *Systema*, 538 F.3d at 1313. None of these criteria are satisfied here.

---

[21] The hearing officer concluded that even though Plaintiff was obtaining an evaluation, the school still was required to make a referral for an evaluation and that the failure to do so was a procedural violation. AR 25-5, 457. The Court does not interpret the relevant statute or caselaw, however, to necessarily hold that a school is *always* required to seek an apparently redundant evaluation—particularly when a parent insists on obtaining a private evaluation, agrees to the school "holding off" on its own evaluation, and then agrees to share the results of the private evaluation with the school. *See Cudjoe*, 297 F.3d at 1066 (commenting that the school "bears the burden *generally* in identifying eligible students for the IDEA" (emphasis added)); 20 U.S.C. § 1412(a)(3) (stating that eligible students "are identified, located, and evaluated" but not stating who must perform that task).

To begin, the school's actions in accepting and then incorporating into the IEP the private evaluation procured by Plaintiff, in lieu of performing its own evaluation, did not result in substantive harm to L.B. or Plaintiff. As the hearing officer observed, the applicable purpose of the child-find obligation in 20 U.S.C. § 1412(a)(3)—the "evaluat[ion]" of a child with disabilities who is "in need of special education or related services"—was fulfilled through the evaluation Plaintiff provided to the school. AR 25-5, 461. Plaintiff has not shown that he or L.B. was substantively harmed by the school's use of this evaluation—which the hearing officer found to be "a *complete* neurological and psychological evaluation *which had the capacity to diagnose TS*, but did not result in a diagnosis of TS"—in lieu of a school-funded evaluation around the same time. *Id.* at 460 (emphasis added). *See* Pl.'s Mot. 14-17, 23-24. Furthermore, Plaintiff has not shown that the resulting IEP would have been any different or issued any sooner, or that some additional educational opportunity would have been provided, had LCPS begun pursuing a screening and evaluation of L.B. in either February 14, 2017, or March 8, 2017. *See id.* at 23-24.

Accordingly, this Court concludes that, even if LCPS committed procedural violations in not pursuing its own evaluation on these dates, any such procedural violation did not (1) substantively harm L.B. or Plaintiff, (2) deprive L.B. of an IEP, or (3) result in the loss of an educational opportunity.[22] Therefore, this Court is convinced that LCPS did not deny L.B. a FAPE in the spring of 2017 when it relied on the private evaluation obtained by L.B.'s father in lieu of commissioning its own separate, school-funded evaluation.

---

[22] Similarly, based on the analysis above, such violations, even if not considered "procedural," did not cause the IEP to no longer be "reasonably calculated to enable [L.B.] to make progress appropriate in light of [his] circumstances," *Endrew F.*, 137 S. Ct. at 999; *see supra* note 17.

**C. The School's Compilation of an IEP in Early May 2017 Did Not Deny L.B. a FAPE.**

Plaintiff next contends that not having an IEP for virtually the entire 2016-2017 school year was a *per se* denial of a FAPE. Pl.'s Mot. 24. This assertion, however, is founded on the critical assumption that in the fall of 2016 the school had reason to suspect that L.B. had a disability that might require special education services. But as discussed in Section IV(a) above, the school did not have a reasonable basis for any such suspicion before February 14, 2017. Thus, at the beginning of the school year, the school's child-find duty had not yet been triggered, and LCPS was therefore not required to evaluate L.B. or create an IEP at that time. *See* 20 U.S.C. § 1412(a). Consequently, this Court concludes that LCPS's formation of an IEP in early May 2017, as opposed to earlier in the school year, did not deny L.B. a FAPE.

**D. The Long-Term Suspension Did Not Deny L.B. a FAPE.**

Plaintiff asserts that the school denied L.B. a FAPE by placing him on long-term suspension after the rock-throwing incident. He suggests that (1) throwing rocks might have been a manifestation of L.B.'s disability, (2) L.B.'s "history of disruptions" in school were manifestations of his disabilities and were wrongfully used as grounds for this suspension, and (3) the school had not provided L.B. an IEP or an evaluation prior to the time it suspended L.B. Pl.'s Mot. 24-26. The Court again disagrees.

Procedurally, for suspensions exceeding ten days, the IDEA first requires the school to determine whether the conduct in question was a "manifestation of the child's disability." 20 U.S.C. § 1415(k)(1)(E). If such conduct was "caused by, or had a direct and substantial relationship to, the child's disability . . . [or] was the direct result of the local educational agency's failure to implement the IEP," then such conduct is considered a manifestation of a disability and a long-term suspension is generally prohibited. § 1415(k)(1)(D)-(E). If the conduct was not a

manifestation of a disability, however, then "the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration." § 1415(k)(1)(C); *see also* § 1415(k)(1)(D) (requiring, *inter alia*, special education services to be continued during long-term suspensions). The statute provides the same procedural protections for children who have not yet been formally determined to be eligible for special education—for example, by requiring the same "manifestation determination" for children who are only suspected of, or currently being evaluated for, a disability. § 1415(k)(1)-(5). Importantly, however, the statute nowhere requires an IEP or an evaluation before a child is placed on long-term suspension. *See id.*

After reviewing the record and giving "due weight" to the hearing officer's factual findings, this Court has no reason to disturb the finding that L.B. intentionally threw rocks at other students on April 19, 2017. L.B.'s conduct on that occasion—including striking a student with four rocks and then striking a separate student with a rock right after having asked something like "do you think I can hit him with a rock?"—certainly seems to suggest intentional conduct, rather than some sort of involuntary, complex motor tic, as suggested by Plaintiff. Pl.'s Mot. 25; *see also* AR 25-6, 312. Thus—in also giving "due weight" to the administrative proceedings, the factual findings of which are considered *prima facia* correct—this Court concludes that the "Manifestation Determination" team correctly concluded that L.B.'s rock-throwing behavior on this occasion was "not a manifestation of his disabilities." AR 25-6, 196-99.

Second, this Court also agrees with the hearing officer's factual findings that the reason for L.B.'s long-term suspension was this rock-throwing event and that the "Manifestation Determination" team considered only this event when concluding L.B.'s behavior was not a manifestation of a disability. *See* AR 25-5 at 447, 468-69; *see also* AR 25-1, 77 (principal stating

that, due to safety concerns, the same long-term suspension would have been sought for any student, regardless of that student's prior conduct); AR 25-6, 160 (principal stating his "main concern [was] the safety of all kids"). Finally, as the IDEA does not require an IEP or an evaluation before a child is placed on long-term suspension, this Court concludes that the decision to place L.B. on long-term suspension was not improper either because the IEP was issued after the suspension or because there had not been a school-funded evaluation.

Because L.B.'s rock-throwing behavior was intentional and not a manifestation of a disability, the school was permitted to apply the same "relevant disciplinary procedures" it would have applied to any other rock-throwing child without a disability. 20 U.S.C. § 1415(k)(1)(C). [23] In addition, because the school still provided L.B. with an appropriate IEP that was in effect during the long-term suspension, it also met its substantive obligation under the IDEA. [24] Therefore, LCPS did not deny L.B. a FAPE by placing him on long-term suspension.

### E. The Excluded Evidence Is Irrelevant as to Whether a FAPE Denial Occurred.

As an additional ground for reversing the hearing officer's decision, Plaintiff posits that the hearing officer erroneously excluded certain evidence from his consideration. Pl.'s Mot. 3, 11, 26. Specifically, he claims that the hearing officer improperly excluded evidence that arose after

---

[23] Although not addressed in Plaintiff's motion, the hearing officer did find a FAPE violation when the school failed to provide witness statements to the "Manifestation Determination" team and to Plaintiff and also to provide a "Long Term Suspension Packet" to the team. AR 25-5, 472-73. While this procedural violation may have "significantly impeded [Plaintiff's] opportunity to participate in the Manifestation Determination IEP process," the hearing officer and this Court found, as explained above, that the conclusion of the "Manifestation Determination" team remain valid—namely, that L.B.'s rock-throwing behavior was intentional and not a manifestation of a disability and that the long-term suspension, which was based on this conduct, was therefore permissible. *Id.* at 473, 482-83. Furthermore, unlike the documentation error in the Manifestation Determination process that impacted Plaintiff's "participation," the subsequent long-term suspension did not cause "substantive harm to [L.B.] or his parents," "deprive [L.B.] of an [IEP]," or "result in the loss of [an] educational opportunity." *Systema*, 538 F.3d at 1313.

[24] In his Motion, Plaintiff does not contest the substance of the IEP. Furthermore, based on the Court's review of the record, the Court has no trouble concluding that the IEP was "reasonably calculated to enable [L.B.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999; *see also* AR 25-5, 478-80 (hearing officer finding that Plaintiff had not met his burden to show that L.B.'s IEP did not meet these standards).

July 31, 2017, the date on which the request for a due process hearing was filed. *Id.* at 26. Plaintiff does not specifically describe all the evidence that was excluded, but it appears to consist primarily of witness testimony about the programs at the CrossRoads alternative school and two documents that the father produced over the summer. AR 25-5, 450, 452-53.[25] Plaintiff asserts that such evidence was relevant to determine whether a FAPE denial occurred and that it would be unfair to require him to file another hearing request merely to have such evidence considered. Pl.'s Mot. 26.

The hearing officer, whose role was to determine whether a procedural violation occurred and whether a FAPE was denied, concluded that such evidence was not relevant or part of a claim that had ripened. *Id.* at 439-40, 450, 452-53. Specifically, he concluded that the witness statements about CrossRoads would have been relevant only for fashioning a remedy of "compensatory education," but because no such remedy was awarded, he did not consider such testimony. *Id.* at 452-53.[26] Similarly, he did not admit the two documents into evidence because they also pertained only to a prospective remedy and were thus deemed to be irrelevant. AR 25-4, 31-33.

This Court concludes that the disputed evidence does not support Plaintiff's arguments before this Court. Specifically, testimony about the programs at the alternative school, along with

---

[25] The documents consist of (1) a printout showing that, sometime before the due process hearing, Plaintiff scheduled L.B. for an evaluation for Tourette's syndrome at the Baylor College of Medicine, which was to occur in November 2017 and (2) a printout from the Tourette Association of America, which showed the locations of "Centers of Excellence" that treat and advocate awareness for TS and which Plaintiff reviewed sometime over the summer of 2017. Pl.'s Mot. 3 n.4; AR 25-4, 31-33. Plaintiff has included these two documents as exhibits within the administrative record and has asked this Court to consider them, which it has as part of its modified *de novo* review. Pl.'s Mot. 3 n.4; AR 25-6, 184, 308-10.

[26] The hearing officer also discussed L.B.'s IEP in the context of L.B.'s attendance at the alternate school, which did not begin until the fall of 2017, shortly before the hearing began. *Id.* at 479. He found that L.B. was not in "a more restrictive environment than his nondisabled peers" who were also at this alternative setting and also found that any claim relating to a failure to properly *implement* the IEP could not yet have ripened. *Id.* at 479-80; *see also* Def.'s Resp., 23, ECF 32 (noting only fifteen days had passed between the first day of school and the due process hearing); *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 20018) (stating that for a claim to be "justiciable under Article III, it must present a live controversy, ripe for determination, advanced in a 'clean-cut and concrete form'" (citing *Renne v. Geary*, 501 U.S. 312, 322 (1991)).

evidence of a future medical appointment and treatment center locations, does not rebut the factual findings that (1) no "suspicion" of a disability requiring special education or related services existed before February 14, 2017; (2) LCPS's reliance on the private evaluation did not substantively harm L.B. or Plaintiff, deprive L.B. of an IEP "reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances," or result in the loss of an educational opportunity; or (3) L.B.'s rock-throwing behavior was not a manifestation of a disability and, therefore, the long-term suspension arising from this conduct was appropriate.

Furthermore, such evidence does not help establish that a procedural violation occurred or that a substantive violation occurred (i.e., that the IEP was not "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"). As mentioned, if these procedural and substantive inquiries do not establish a denial of a disabled student's right to a FAPE, then "the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207.

In sum, this Court holds that the excluded evidence is irrelevant as to whether L.B. was denied his right to FAPE. The hearing officer's exclusion of this evidence from consideration was not improper.

## V. CONCLUSION

For the foregoing reasons, the Court holds that LCPS did not deny L.B. a free, appropriate public education.

**IT IS THEREFORE ORDERED** that the hearing officer's decision is **AFFIRMED** and Plaintiff's Motion is **DENIED**.

**IT IS SO ORDERED**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*